# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **WANDA G. THOMAS**, | ) | |
| Plaintiff, | ) | Civil Action No. 1:07cv00022 |
| | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security**, | ) | BY: Pamela Meade Sargent |
| Defendant. | ) | United States Magistrate Judge |

In this social security case, I will vacate the final decision of the Commissioner terminating benefits and remand this case to the Commissioner for further consideration.

## I. Background and Standard of Review

Plaintiff, Wanda G. Thomas, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Thomas's claim for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

Case 1:07-cv-00022-PMS   Document 17   Filed 05/23/08   Page 1 of 32   Pageid#: 440

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Thomas protectively filed applications for DIB and SSI on or about October 26, 1998, alleging disability as of June 13, 1997, due to a psychotic disorder.[1] (Record, ("R."), at 13, 121-24, 364-66.) The claims were denied initially and on reconsideration. (R. at 67-71.) Thomas then timely requested a hearing before an administrative law judge, ("ALJ"). (R. at 72.) Prior to Thomas's hearing before an ALJ, a prehearing case review was conducted by an attorney advisor. *See* 20 C.F.R. §§ 404.942, 416.1442 (2007). By decision of the attorney advisor dated April 16, 1999, Thomas was found disabled for DIB purposes as of June 13, 1997, and for SSI purposes as of October 16, 1998. (R. at 13, 53-59, 62.) The attorney advisor found that Thomas met the insured status requirements of the Act for DIB purposes on June 13, 1997, and that Thomas had not performed any substantial gainful activity since that date. (R. at 58.) The

---

[1]A "Query in Lieu of Supplemental Security Income Application" is included in the record. (R. at 364-66.)

-2-

attorney advisor also found that Thomas's impairments, which were considered severe under the Act, were psychotic disorder, not otherwise specified, ("NOS"), recurrent major depression and borderline intellectual functioning. (R. at 58.) The attorney advisor found that Thomas's impairments were attended with the same signs and findings as those published in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 58.) Thus, the attorney advisor found that Thomas had been under a disability since June 13, 1997. (R. at 58.) By an order dated May 28, 1999, an ALJ dismissed Thomas's administrative hearing request pursuant to 20 C.F.R. §§ 404.942(d), 416.1442(d), and ordered that the attorney advisor's decision dated April 16, 1999, become the final decision of the Commissioner. (R. at 62.)

On May 4, 2005, the Commissioner terminated Thomas's benefits as of April 1, 2005, finding that her condition had greatly improved and was responding well to medications. (R. at 73-75.) Thomas requested a reconsideration, (R. at 78), but the cessation determination was upheld. (R. at 96-98.) Thomas then timely requested a hearing before an ALJ. (R. at 108.) The ALJ held a hearing on July 27, 2006, and a supplemental hearing on December 19, 2006. (R. at 22-34, 35-50.) Thomas was represented by counsel at both hearings. (R. at 22-34, 35-50.)

By decision dated January 22, 2007, the ALJ affirmed the finding that, as of April 1, 2005, Thomas no longer was disabled. (R. at 13-18.) The ALJ found that Thomas was previously determined to be disabled within the meaning of the Act beginning June 13, 1997, and that she had not engaged in substantial gainful activity since that date. (R. at 16.) The ALJ also found that the current medical evidence established that Thomas had borderline intellect or mild mental

retardation and that her psychotic disorder was well-controlled with medication and counseling. (R. at 17.) The ALJ found, however, that Thomas's impairment no longer met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ also found that, as of the most recent favorable disability determination on April 16, 1999, Thomas's impairments were found to be psychotic disorder of the severity to meet the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03C, recurrent major depression and borderline intellect. (R. at 17.) The ALJ further determined that Thomas's medical condition had improved since April 16, 1999, and that the improvement was related to her ability to work. (R. at 17.) While the ALJ found that the medical evidence established that Thomas currently had an impairment or combination of impairments which were severe, the ALJ concluded that since April 1, 2005, Thomas had the residual functional capacity to perform the exertional and nonexertional requirements of work except for that requiring the performance of skilled, complex and detailed tasks. (R. at 17.) The ALJ found that beginning April 1, 2005, Thomas's allegations of disabling symptoms were not credible and were not supported by the documentary evidence. (R. at 17.) The ALJ also found that the Thomas's past relevant work as a bagger/stocker did not require the performance of work-related activities precluded by any of Thomas's limitations, and that he found her impairments did not prevent her from performing her past relevant work. (R. at 17.) As a result, the ALJ found that Thomas was not under a disability as of April 1, 2005, as defined in the Act, and that she was no longer entitled to benefits. (R. at 17-18.) *See* 20 C.F.R. §§ 404.1594(f)(7), 416.994(b)(5)(vi) (2007).

After the ALJ issued his decision, Thomas pursued her administrative appeals, but the Appeals Council denied review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 5-8.) *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). Thereafter, Thomas filed this action seeking review of the ALJ's unfavorable decision. The case is before the court on the Commissioner's motion for summary judgment filed October 25, 2007.[2]

## II. Facts

Thomas was born in 1972, which classifies her as a younger person. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c) (2007). (R. at 121.) According to the record, Thomas has a high school education and past relevant work experience as a bagger/stocker in a grocery store. (R. at 14, 44.)

At Thomas's initial hearing before the ALJ, Thomas testified that she was single and that she lived with her grandmother and cousin. (R. at 38.) She testified that she had received Social Security disability benefits since she had a nervous breakdown in 1997 and that she had not worked since that time. (R. at 38.) Thomas also testified that she was currently being treated for a psychotic disorder, depression and anxiety and that she was taking medications for those conditions. (R. at 39.) Thomas stated that she had memory problems, mood swings, trouble concentrating and crying spells that lasted "[a]bout all day." (R. at 40-42.) She testified, however, that she fed the cat, cooked meals, folded clothes and washed

---

[2]Thomas did not file a motion for summary judgment.

-5-

dishes. (R. at 43.) She testified that she worked as a bagger/stocker at a grocery store prior to the nervous breakdown in 1997. (R. at 44.) She stated that she was unable to return to work because she could not "take the criticism from other people . . . [and would] probably start crying." (R. at 44.)

Thomas stated that she could not perform the jobs of a ticket taker or laundry folder due to her inability to deal with criticism and her fear of making mistakes. (R. at 44-46.) Thomas testified that while her condition had improved, she did not feel that she could return to work. (R. at 47.) Thomas described an average day as starting around 9 a.m. with a cup of coffee, then feeding the cat, microwaving meals, watching television or reading the newspaper, going places with her family and listening to music. (R. at 46-47.) She testified that she lived with her grandmother almost all her life and that she did not perform any chores for her, except bringing her water from time to time. (R. at 48-49.) She also reported that she attended church twice a week. (R. at 47.)

Thomas had a supplemental disability hearing on December 19, 2006. (R. at 22-34.) At Thomas's supplemental hearing, Thomas E. Schacht, a medical expert, testified regarding Thomas's mental health history. (R. at 24-31.) Schacht testified that there was a factual discrepancy in the record as to how much assistance Thomas provided her grandmother. (R. at 26.) He also noted that in Thomas's first visit after her hospitalization at Woodridge Hospital, she was able to discuss the pros and cons of relationship issues, which indicated that she was not delusional at that time. (R. at 27.)

-6-

Schacht discussed a psychology report completed by Kathy Miller, M.Ed., a licensed psychological examiner, and Robert Spangler, Ed.D., a licensed psychologist, at the request of the Virginia Department of Rehabilitative Services,[3] (R. at 351-56), which indicated that Thomas had a performance intelligence quotient, ("IQ"), in the mildly retarded range, and he noted that it appeared to be inconsistent with the other evidence of record. (R. at 27-29.) Schacht testified that Thomas's standardized test scores, received during her 6th, 8th and 11th grade years, did not suggest mental retardation. (R. at 29.) Schacht also stated that, "[o]verall, [he] found it difficult in light of the school record to support a conclusion that [Thomas's] performance IQ [was] related to intellectual limitation . . ." (R. at 29.) Schacht testified that he did not believe Thomas feigned her performance IQ test administered by Spangler and Miller, but he stated that if Thomas had a vision problem, it would have selectively affected the performance IQ test. (R. at 32.) Thomas testified she forgot her glasses at home the day of the test. (R. at 32.)

Schacht also referenced an Assessment To Do Work Related Activity, completed by Billy Manuel, LPC, M.Ed.,[4] and noted that if this functional assessment were accepted as a statement of functioning on a persistent basis, Thomas would be at a disability listing level. (R. at 29-30.) However, Schacht noted that this assessment was "not consistent with the treatment record and [there was] no recent record of treatment contact with Mr. Manuel." (R. at 30.) It is important to note that, while Schacht questioned the validity of Manuel's

[3]Miller and Spangler completed this report on September 5, 2006. (R. at 351-56.)

[4]Manuel completed this form on October 18, 2006. (R. at 362.)

functional assessment, he did not offer any opinion as to Thomas's work-related abilities.

Norman E. Hankins, a vocational expert, also was present and testified at Thomas's hearing. (R. at 32-33.) Hankins identified Thomas's past work as a grocery bagger as unskilled work that required medium[5] exertion. (R. at 33.) In response to a hypothetical set forth by the ALJ, Hankins stated that an individual would be unable to work if she possessed a seriously limited, but not precluded, ability to maintain judgment, to interact with supervisors, to deal with work stresses and to maintain attention and concentration and no ability to behave in an emotionally stable manner. (R. at 33.) Hankins also stated that an individual with no more than moderate limitations would be able to work. (R. at 33.)

The ALJ reviewed records from Woodridge Hospital; Bristol Regional Medical Center; Thomas E. Schacht, a medical expert; Norman Hankins, a vocational expert; Dr. Terry C. Borel, M.D., a psychiatrist; Sheila Russell, C.F.N.P.; Billy Manuel, L.P.C., M.Ed., an adult outpatient therapist; Dr. Darlene Litton, M.D.; R.J. Milan Jr., Ph.D., a state agency psychologist; Joseph Leizer, Ph.D., a state agency psychologist; Barry Friedman, Ph.D., a psychological consultant; Charles M. Tucker, Ph.D., a state agency psychologist and consultant; Bristol Regional Counseling Center; Linda Barger, M.S.N., R.N.; Dr. Donna McKenzie, M.D., a psychiatrist; Dr. Ashvin Patel, M.D., a psychiatrist; Kathy J.

---

[5]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2007).

Miller, M.Ed., a licensed psychological examiner; Robert S. Spangler, Ed.D., a licensed psychologist; E. Hugh Tension, Ph.D., a state agency psychologist; Eugenie Hamilton, Ph.D., a state agency psychologist; and Maurice Prout, Ph.D., a medical consultant.

Thomas presented to Bristol Regional Medical Center, ("BRMC"), on June 14, 1997, with delusions, suicidal thoughts, word salad, mental confusion and anxiety. (R. at 178-79.) She was diagnosed with schizophrenia. (R. at 178.) After being discharged from BRMC, Thomas was admitted to Woodridge Hospital. (R. at 178-80.) Upon admission to Woodridge Hospital, Thomas was psychotic and disoriented to self, time, place and purpose. (R. at 179.) Thomas voiced suicidal ideations and stated that she heard voices. (R. at 179.) Thomas's physical examination and blood tests were within normal limits, and a urine drug screen was negative. (R. at 179.) Sheila Russell, C.F.N.P., and Dr. Terry C. Borel, M.D., a psychiatrist, found Thomas to be very confused, disoriented and nonsensical. (R. at 181.) At admission, Thomas was diagnosed with psychotic disorder, NOS, while schizophrenic disorganized type was ruled out, and her Global Assessment of Functioning, ("GAF"),[6] score was assessed at 15.[7] (R. at 180, 183.) The record indicates that Thomas had recently ended a relationship with her boyfriend. (R. at 179.) A computerized axial tomography scan, ("CT scan"), of the head, performed

---

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7]A GAF of 11-20 indicates some danger of hurting self or others or occasional failure to maintain minimal personal hygiene or gross impairment in communication. *See* DSM-IV at 32.

on June 19, 1997, was normal. (R. at 184.) Thomas was discharged on June 23, 1997, at which time she was alert, oriented and cooperative, with linear thought processes and no psychotic symptoms or delusions. (R. at 180.) She was discharged with a diagnosis of psychosis, NOS, and her then-current GAF score was assessed at 50.[8] (R. at 180.)

An intake form from Central Appalachia Services, ("CAS"), was completed on June 30, 1997, by Billy Manuel, L.P.C., M.Ed., an adult outpatient therapist. (R. at 197-203.) The intake form noted that Thomas had been hospitalized at Woodridge Hospital for nine days, during which time she was unable to recognize relatives, was confused, had insomnia and "saw things that [were not] there." (R. at 197.) Her mental status was described as "fidgety" and nervous. (R. at 202.) Manuel noted that Thomas's provisional treatment goal was to stabilize her mood and avoid rehospitalization. (R. at 202.) Her then-current GAF score was assessed at 51-60,[9] and she was diagnosed with psychotic disorder, NOS. (R. at 195-96, 202.)

On July 14, 1997,[10] treatment notes from CAS indicated that Thomas was somewhat reserved, talked little and was slightly guarded. (R. at 194.) However, the notes indicated that Thomas had no obvious psychosis. (R. at 194.) Thomas

[8]A GAF of 41-50 indicates that the individual has "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32.

[9]A GAF of 51-60 indicates that the individual has "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning . . . ." DSM-IV at 32.

[10]Thomas's treatment notes from CAS from July 14, 1997, to January 11, 1999, are mostly illegible. (R. at 185-94, 205-08.)

presented to BRMC on July 17, 1997, with complaints of numbness, blurred vision and difficulty in breathing. (R. at 209.) She was diagnosed with anxiety neurosis. (R. at 209.) Thomas presented to CAS on July 28, 1997, and reported feeling less anxious, less worried and more comfortable. (R. at 193.) She also reported being seen in the ER after having a panic attack. (R. at 193.) On August 20, 1997, Thomas noted that she was apprehensive about major changes in her life. (R. at 192.) On September 7, 1997, Thomas's grandmother called CAS and stated that Thomas was having a "spell" accompanied by muscle spasms in her face, loss of vision, feelings of numbness, faint feelings and breathing problems. (R. at 193.) Thomas's grandmother was instructed to take Thomas to the ER for evaluation. (R. at 193.)

Thomas's mood was improved on October 6, 1997, and she denied depressive thoughts. (R. at 191.) She was diagnosed with psychosis, NOS, and prescribed Loxitane and imipramine. (R. at 191.) On October 23, 1997, Thomas stated that it was difficult not having a job, her own money or a car. (R. at 191.) She also reported normal eating and sleeping habits. (R. at 191.) Thomas again presented to CAS on February 19, 1998, and reported a decrease in nervousness and depression. (R. at 190.) While it was noted that Thomas was still slow to respond, she was assessed as having more self-esteem, more awareness and better health habits. (R. at 190.)

On April 17, 1998, Thomas informed CAS that she may have a job at a grocery store, a goal that she had set for herself. (R. at 189.) On May 4, 1998, Thomas's prescription for Loxitane was discontinued, and she was prescribed

Case 1:07-cv-00022-PMS   Document 17   Filed 05/23/08   Page 11 of 32   Pageid#: 450

Zyprexa. (R. at 189.) On May 11, 1998, Thomas was feeling "much better since [being prescribed] Zyprexa[,]" and she had more energy. (R. at 188.) Thomas presented to CAS again on May 28, 1998, and reported working at a hotel and having a new boyfriend. (R. at 188.) On July 23, 1998, progress notes indicate that Thomas "had a job at Food City, but quit because her grandmother needed her." (R. at 187.) Thomas reported that she washed dishes, made beds, prepared the table for meals and walked the dog. (R. at 187.) On July 27, 1998, Thomas's dosage of Zyprexa was reduced. (R. at 187.) On October 15, 1998, Thomas's progress notes indicated she was doing "much better since Zyprexa was reduced. She no longer [fell] asleep in church [and was] more alert during the day." (R. at 186.) On January 11, 1999, Thomas reported doing well and "had a good Christmas season." (R. at 185.)

Thomas was treated by Dr. Darlene Litton, M.D., from September 1, 1997, to April 14, 1998.[11] (R. at 211-19.) An upper gastrointestinal series performed on September 23, 1997, revealed mild antral gastritis/duodenitis and mild gastroesophageal reflux. (R. at 218.) On September 1, 1997, Dr. Litton diagnosed Thomas with anxiety, depression and possible schizophrenia. (R. at 217.) Thomas presented to Dr. Litton on October 23, 1997, complaining that her "food [did not] go all the way down." (R. at 215.) Thomas was described as having a flat affect and was diagnosed with gastritis, duodenitis, anxiety and depression. (R. at 215.) On January 21, 1998, Thomas reported having "no taste" since her hospitalization at Woodridge Hospital, and she reported that she would go two to three days without eating much and would "gag" after eating. (R. at 214.) On December 10,

---

[11]Dr. Litton's treatment notes are mostly illegible.

1997, Manuel reported in a letter that Thomas would be unable to work for approximately six months. (R. at 220.)

Barry Friedman, Ph.D., a licensed clinical psychologist, examined Thomas at the request of the Virginia Department of Rehabilitative Services and completed a Psychologist Report on January 20, 1999. (R. at 230-34.) Friedman considered Thomas's statements to be reliable, and he reported her level of cooperation as excellent. (R. at 230.) However, Friedman noted that Thomas presented as extremely fragile. (R. at 232.) Thomas stated that she had been taking her medications as prescribed, that her medications were completely effective and that they did not cause any negative side effects. (R. at 231.) Thomas also reported that, "I can't concentrate. I get real nervous when I try to work." (R. at 231.) Thomas reported no history of serious behavioral problems. (R. at 231.) She stated that she independently bathed, maintained toilet training, dressed, fed herself and took her medicines correctly. (R. at 231.) She also reported that she independently dusted furniture, swept, vacuumed, cooked simple meals and washed laundry. (R. at 232.) However, Thomas stated that it took her longer than other individuals to complete domestic chores. (R. at 232.) She stated that she was able to interact with family members, neighbors and friends. (R. at 232.) Thomas also stated that she was able to receive visitors, visit others and attend church about once a week. (R. at 232.) Thomas further stated that she was able to spend and budget appropriately and to assume responsibility for scheduling and keeping appointments. (R. at 232.)

Friedman opined that Thomas overestimated her own abilities, and that the functional limitations she described were not self-imposed or exaggerated. (R. at

-13-

232.) Thomas was fully oriented with a blunted affect, but Friedman noted no difficulties concerning expressive or receptive language skills. (R. at 232.) She was alert, sober and responsive, Friedman reported no signs of psychosis and Thomas reported that she had not experienced psychotic symptoms lately. (R. at 233.) Friedman also deemed her insight to be fair, noting that it would be difficult for her to develop it further. (R. at 234.) Friedman estimated Thomas's intellectual ability to be in the borderline range, and he diagnosed her with major depressive disorder, recurrent, and ruled out dependent personality disorder. (R. at 234.)

R.J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on January 26, 1999. (R. at 221-29.) Milan's assessment revealed that Thomas suffered from an affective disorder and a personality disorder, but that a residual functional capacity assessment was necessary. (R. at 221.) Milan concluded that Thomas suffered from a disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by sleep disturbance, hallucinations, delusions or paranoid thinking. (R. at 224.) Milan also concluded that Thomas possessed inflexible and maladaptive personality traits, which caused either significant impairment in social or occupational functioning or subjective distress, as evidenced by pathological dependence. (R. at 226.) Milan further concluded that Thomas had a slight restriction in her activities of daily living, had a moderate difficulty in maintaining social functioning, and that she often had deficiencies of concentration, persistence or pace, resulting in failure to complete tasks in a timely manner, in work settings or elsewhere, and that she never had any episodes of deterioration or decompensation. (R. at 228.) Joseph Leizer, Ph.D., another state agency

-14-

psychologist, reviewed Milan's report and affirmed his findings on February 26, 1999. (R. at 222.)

Milan also completed a Mental Residual Functional Capacity Assessment, ("MRFC"), on January 26, 1999. (R. at 235-37.) Milan found that Thomas was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the public and to set realistic goals or make plans independently of others. (R. at 235-36.) Leizer affirmed Milan's findings on February 26, 1999. (R. at 237.) On February 10, 1999, Charles M. Tucker, Ph.D., another state agency psychologist and medical consultant, reviewed the MRFC and PRTF dated January 26, 1999, and agreed in all the areas assessed therein. (R. at 238-42.)

Thomas was treated at Med Express from January 22, 2004, to April 18, 2005, for symptoms unrelated to her disability determination and for regular check-ups and medication refills. (R. at 243-59.) Thomas was treated at Bristol Regional Counseling Center, ("BRCC"), from April 22, 1999, to June 15, 2006. (R. at 260-74, 322-50.) On January 28, 2002, Thomas was seen for a routine medical evaluation by Dr. J. Nuri Yong, M.D., a psychiatrist. (R. at 345.) At that time, Thomas interacted without difficulty, denied any psychotic symptoms, denied significant depressive symptoms and denied any homicidal or suicidal thoughts. (R. at 345.) Thomas reported increased irritability and sad feelings in the week preceding her menstrual period, for which she was prescribed Atarax. (R. at 345.)

-15-

Thomas presented to Dr. Yong again on April 22, 2002, and her mood was described as appropriate. (R. at 343.) She engaged in conversation rather easily and had no additional complaints of irritability. (R. at 343.) Thomas denied psychotic symptoms, homicidal or suicidal thoughts, crying spells, difficulty with appetite or sleep, side effects from her medication and auditory hallucinations or other symptoms of decompensation. (R. at 343.) Thomas noted that Atarax was helping her cope well with premenstrual problems. (R. at 343.) Thomas presented to Dr. Yong again on July 15, 2002, for a routine medical evaluation. (R. at 341.) Thomas initiated conversation without difficulty and denied any psychotic symptoms. (R. at 341.) Dr. Yong noted that Thomas "continue[d] to praise the benefits of Atarax." (R. at 341.) Thomas denied homicidal or suicidal thoughts, but she reported a couple of crying spells. (R. at 341.) On October 7, 2002, Thomas was again noted to engage easily in conversation, denied psychotic symptoms and suicidal or homicidal thoughts, denied crying spells and noted that Atarax was very helpful. (R. at 339.)

Thomas presented to Dr. Yong on December 17, 2002, and was described as pleasant and stable. (R. at 338.) Thomas denied psychotic symptoms. (R. at 338.) Dr. Yong reported no evidence of paranoia, delusions, hypomania, mania or other symptoms of decompensation. (R. at 338.) On March 10, 2003, Thomas was diagnosed with psychotic disorder, NOS, and personality disorder, NOS. (R. at 336.) Thomas's cognitive orientation and memory were intact, her intellectual functioning was reported as below average and her GAF was assessed at 75.[12] (R.

---

[12]A GAF of 71-80 indicates that, "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors . . . no more than slight impairment in social, occupational, or school functioning . . . ." DSM-IV at 32.

at 336.) Thomas again presented to Dr. Yong on May 8, July 31, and October 16, 2003, and January 8, 2004. (R. at 330-35.) She continued to deny psychotic symptoms and expressed that she was doing well on her medication. (R. at 330-35.)

Thomas presented to Manuel on February 20, 2004, and it was noted that Thomas had made progress in keeping appointments, in being less withdrawn, by having no rehospitalizations, by having no anger, by making positive statements and in having better self-esteem. (R. at 271.) At that time, Thomas also reported that she attended church and went out with her sister. (R. at 271.) On April 2, 2004, Dr. Donna McKenzie, M.D., described Thomas's mood as euthymic and noted that Thomas had a full range and appropriate affect. (R. at 270.) Dr. McKenzie also found Thomas's thought processes to be linear and coherent, without gross impairment of insight and judgment. (R. at 270.) Thomas denied psychotic, manic or depressive symptoms. (R. at 270.) On April 16 and June 18, 2004, Manuel reported further progress with Thomas's treatment. (R. at 268-69.) Manuel also noted that Thomas believed volunteer work would help her mental and physical health. (R. at 268.)

Dr. McKenzie saw Thomas for a routine medical evaluation on June 24, 2004. (R. at 267.) Dr. McKenzie reported that Thomas denied psychotic symptoms. (R. at 267.) Additionally, Dr. McKenzie found no evidence of paranoia, delusion or thought disorder. (R. at 267.) Dr. McKenzie also found Thomas to be appropriate throughout the interview. (R. at 267.) On July 23 and September 10, 2004, Manuel reported that Thomas continued to make progress. (R. at 265-66.) He

-17-

also reported that she appeared to have more self-esteem and independence. (R. at 266.) Thomas presented to Dr. McKenzie for a routine medical evaluation on September 16, 2004, reporting no psychotic symptoms. (R. at 264.) Thomas also denied crying spells and sadness, but admitted to occasional tearfulness. (R. at 264.) On November 5, 2004, Manuel reported that Thomas had exhibited increased rational thinking and had attended a women's auxiliary at her church. (R. at 263.) Manuel also noted progress due to Thomas's lack of rehospitalization, absence of psychotic symptoms and lack of crying spells. (R. at 263.)

On December 9, 2004, Dr. McKenzie reported that Thomas's affect was appropriate, and her mood was stable. (R. at 262.) On January 7, 2005, Manuel reported that Thomas's medication was "agreeing with her." (R. at 261.) Manuel noted continued progress and the absence of a negative mood or low self-esteem. (R. at 261.) On February 24, 2005, Dr. McKenzie found that Thomas was stable, her thought processes were linear and coherent and that her affect was somewhat restricted. (R. at 260.) Thomas denied psychotic symptoms, and Dr. McKenzie noted no evidence of decompensation during the interview. (R. at 260.)

On May 20, 2005, Manuel noted a more positive mood for Thomas. (R. at 272.) However, Manuel stated that Thomas needed to improve her self-esteem. (R. at 272.) On May 12, 2005, Linda Barger, M.S.N., found Thomas's mood to be low and her affect to be restricted. (R. at 273.) At that time, Thomas reported that her main concern was whether she would lose her disability benefits. (R. at 273.) Other than noting this worry, Barger stated that Thomas seemed to be maintaining. (R. at 273.) Thomas denied psychotic symptoms. (R. at 273.) On April 8, 2005, Thomas

-18-

reported to Manuel that she was nervous, forgetful and had crying spells about once a week. (R. at 274.)

Thomas presented to Dr. Ashvin Patel, M.D., a psychiatrist with BRCC, on July 28, 2005. (R. at 329.) Dr. Patel noted that Thomas's anxiety was increased because she was undergoing a disability review. (R. at 329.) Thomas reported no significant problems since her last visit and noted that Atarax continued to be helpful. (R. at 329.) Dr. Patel reported that, "[s]he does seem very timid and the disability hearing is very frightening to her." (R. at 329.) Thomas's mood was described as somewhat anxious, and her affect was restricted. (R. at 329.) Her thought processes were linear and coherent, she denied psychotic symptoms and her insight and judgment were without gross impairment. (R. at 329.)

On October 19, 2005, Dr. Patel noted that, Thomas "has had some stress and has apparently lost her disability benefits." (R. at 328.) Dr. Patel noted some dependent features and difficulty in problem solving. (R. at 328.) Dr. Patel's mental status examination remained the same as reported in the previous visit. (R. at 328.) Thomas returned to BRCC on January 5 and March 23, 2006, complaining of continued anxiety. (R. at 326-27.) On March 23, 2006, Dr. Patel advised Thomas to discontinue Zyprexa and prescribed Geodon. (R. at 326.) Thomas returned on April 20, 2006, and reported that she was feeling better since starting Geodon and discontinuing Zyprexa. (R. at 324.) Thomas denied any new stressors or problems, her mood was stable and she denied psychotic symptoms. (R. at 324.) On June 15, 2006, Dr. Patel noted continued dependency features, a restricted affect and an otherwise normal mental examination. (R. at 323.) On August 31,

-19-

2006, Thomas returned to Dr. Patel and reported increased anxiety due to disability testing. (R. at 361.) Dr. Patel stated that Thomas's mood was stable with no increase in depression, accompanied by an anxious and restricted affect. (R. at 361.) Thomas reported no increase in psychotic symptoms. (R. at 361.)

Kathy J. Miller, M.Ed., a licensed psychological examiner, and Robert S. Spangler, Ed.D., a licensed psychologist, completed a psychological examination on April 19, 2005, at the request of Disability Determination Services. (R. at 275-79.) Miller and Spangler reported that Thomas demonstrated awkwardness with gross motor movement and walked with an unusual gait. (R. at 275.) They reported that Thomas appeared to be socially confident and comfortable. (R. at 275.) Miller and Spangler also stated that Thomas understood the instructions for each task and demonstrated good concentration. (R. at 275.) Thomas reported that she worked as a bagger for Food City for seven years, worked at Conoco as a cashier, worked in general labor for two months and worked as a cashier at Eagle Mart for six months. (R. at 276.) She also reported that after she returned to Food City, as a bagger, she quit after two weeks, because "[her] nerves couldn't handle it." (R. at 276.) Thomas stated that she had not worked since 1997. (R. at 276.) Miller and Spangler found Thomas to be alert and oriented and noted no depression or anxiety. (R. at 276-77.) They also found Thomas to have an immature presentation "as a person much younger than her chronological age." (R. at 277.) Miller and Spangler stated that Thomas appeared to be a person of low average intelligence, but was emotionally stable when taking her current medications and attending supportive counseling. (R. at 277.) They also stated that Thomas's social skills were adequate and that she communicated in a clear, coherent manner. (R. at 277.)

-20-

Miller and Spangler diagnosed major depression, single episode, severe with psychotic features in good pharmacological control; low average intellectual functioning estimated by vocabulary education, work history, fund of knowledge and traits of dependent personality disorder. (R. at 278.) Her GAF score was assessed at 70.[13] (R. at 278.)

E. Hugh Tenison, Ph.D., a state agency psychologist, completed an MRFC on April 27, 2005. (R. at 280-85.) Tenison indicated that Thomas was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors and in her ability to set realistic goals or make plans independently of others. (R. at 280-81.) Eugenie Hamilton, Ph.D., another state agency psychologist, affirmed Tenison's findings on June 13, 2005. (R. at 282.)

Tenison also completed a PRTF on April 27, 2005. (R. at 286-99.) Tenison's assessment revealed that Thomas suffered from depressive syndrome, but that her disorder was in good pharmacologic control. (R. at 289.) Tenison also indicated

---

[13]A GAF of 61-70 indicates that the individual has "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . , but [is] generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

that Thomas had moderate to mild difficulties in maintaining concentration, persistence or pace, mild to no difficulties in maintaining social functioning, no restriction in her activities of daily living and no episodes of decompensation. (R. at 296.) Tenison indicated that Thomas "certainly appear[ed] to be capable of at least simple, unskilled work." (R. at 298.) State agency psychologist Hamilton affirmed Tenison's findings on June 13, 2005. (R. at 286.) On May 4, 2005, Maurice Prout, Ph.D, another state agency psychologist and medical consultant, reviewed Thomas's MRFC and PRTF dated April 27, 2005, and agreed in all the areas assessed therein. (R. at 300-03.)

Miller and Spangler completed another psychological examination on September 5, 2006, at the request of Disability Determination Services. (R. at 351-56.) Miller and Spangler reported that Thomas was cooperative, generally understood the instructions for each task and demonstrated good concentration. (R. at 351.) Miller and Spangler reported that Thomas demonstrated awkwardness with gross motor movement and walked with an unusual gait. (R. at 351.) They also reported that Thomas appeared to be socially confident and comfortable. (R. at 351.) Miller and Spangler found Thomas's mood to be generally stable and noted that she "[got] along well with people in general." (R. at 352.) Thomas denied auditory or visual hallucinations. (R. at 352.) Miller and Spangler noted that, according to outpatient mental health professionals, Thomas appeared to be functioning at a stable baseline level with no exacerbation of symptoms. (R. at 352.) Miller and Spangler also opined that Thomas had borderline intelligence, but was emotionally stable while on her current medications. (R. at 353.)

Thomas reported that she attended church and Sunday school every week, and she explained that she was driven to the laundry and to the grocery store weekly, washed dishes and swept the floor. (R. at 353.) Miller and Spangler stated that Thomas related well and was polite, cooperative and pleasant. (R. at 353.) They also stated that, due to Thomas's intellectual verbal functioning and education level, she had the judgment necessary to handle her financial affairs. (R. at 353.) Miller and Spangler administered the Wechsler Adult Intelligence Scale-Revised, ("WAIS-III"), test, and Thomas achieved a verbal IQ score of 90, a performance IQ of 68 and a full-scale IQ of 78. (R. at 354.) Miller and Spangler opined that Thomas's full-scale IQ placed her in the borderline range of intellectual functioning. (R. at 354.) Miller and Spangler also administered the Wide Range Achievement Test-Revision 3, ("WRAT3"). (R. at 354.) Thomas's reading scores placed her at a high-school grade level, and her arithmetic scores placed her at a sixth-grade level. (R. at 354.) Thomas's Wechsler Memory Scale-Third Revision, ("WMS-III"), scores fell between the borderline to average range and were consistent with her intellectual functioning scores. (R. at 354-55.) Miller and Spangler diagnosed psychotic disorder, NOS, in good pharmacological control, and mild mental retardation based on her performance IQ score. (R. at 355.) Thomas's then-current GAF score was assessed at 65. (R. at 355.)

Miller and Spangler also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental). (R. at 357-59.) They indicated that Thomas had a slight impairment in her ability to understand, remember and carry out short, simple instructions, to make judgments on simple work-related decisions and to interact appropriately with the public, with supervisors and with co-workers.

-23-

(R. at 357-58.) They also indicated that Thomas had a moderate limitation in her ability to understand, remember and carry out detailed instructions, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. at 357-58.)

On October 18, 2006, Manuel completed an Assessment To Do Work Related Activity. (R. at 362.) He indicated that Thomas had a limited, but satisfactory, ability to relate to co-workers, to deal with the public, to function independently and to maintain personal appearance and demonstrate reliability. (R. at 362.) He also indicated that Thomas had a seriously limited, but not precluded, ability to use judgment, interact with supervisors, to deal with work stresses, to maintain attention and concentration and to relate predictably in social situations. (R. at 362.)

### III. Analysis

The Commissioner uses a seven-step process in evaluating whether a claimant's benefits should be terminated. *See* 20 C.F.R. §§ 404.1594(f), 416.994(b)(5)(i)-(vii) (2007). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has an impairment that meets or equals the requirements of a listed impairment; 3) has seen medical improvement in her previously disabling condition; 4) has seen an increase in her residual functional capacity; 5) has a severe impairment; 6) can return to her past relevant work; and 7) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1594(f), 416.994(b)(5)(i)-(vii) (2007). If the Commissioner finds conclusively that a claimant is disabled at any point in this process, review does not proceed to

-24-

the next step. *See* 20 C.F.R. §§ 404.1594(f), 416.994(b)(5) (2007).

By decision dated January 22, 2007, the ALJ affirmed the finding that, as of April 1, 2005, Thomas no longer was disabled. (R. at 13-18.) The ALJ found that Thomas was previously determined to be disabled within the meaning of the Act beginning June 13, 1997, and that she had not engaged in substantial gainful activity since that date. (R. at 16.) The ALJ also found that the current medical evidence established that Thomas had borderline intellect or mild mental retardation and that her psychotic disorder was well-controlled with medication and counseling. (R. at 17.) The ALJ found, however, that Thomas's impairment no longer met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ also found that, as of the most recent favorable disability determination on April 16, 1999, Thomas's impairments were found to be psychotic disorder of the severity to meet the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03C, recurrent major depression and borderline intellect. (R. at 17.) The ALJ further determined that Thomas's medical condition had improved since April 16, 1999, and that the improvement was related to her ability to work. (R. at 17.) While the ALJ found that the medical evidence established that Thomas currently had an impairment or combination of impairments which were severe, the ALJ concluded that since April 1, 2005, Thomas had the residual functional capacity to perform the exertional and nonexertional requirements of work except for that requiring the performance of skilled, complex and detailed tasks. (R. at 17.) The ALJ found that beginning April 1, 2005, Thomas's allegations of disabling symptoms were not credible and were not supported by the documentary evidence. (R. at 17.) The ALJ

-25-

also found that the Thomas's past relevant work as a bagger/stocker did not require the performance of work-related activities precluded by any of Thomas's limitations, and he found that her impairments did not prevent her from performing her past relevant work. (R. at 17.) As a result, the ALJ found that Thomas was not under a disability as of April 1, 2005, as defined in the Act, and that she was no longer entitled to benefits. (R. at 17-18.) *See* 20 C.F.R. §§ 404.1594(f)(7), 416.994(b)(5)(vii) (2007).

In her brief, Thomas argues that the ALJ erred in finding that she did not meet the listing for mental retardation. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-13.) Specifically, Thomas argues that she meets Listing 12.05C. (Plaintiff's Brief at 8-13.) Thomas makes no argument that she meets the listing for psychotic disorders, the listing for which she was previously found disabled.

As a preliminary matter, I note that the previous finding of Thomas's disability does not impose a presumption of continuing disability. *See* 42 U.S.C.A. § 423(f) (West 2003 & Supp. 2007); *Crawford v. Sullivan*, 935 F.2d 655, 656-57 (4th Cir. 1991); *Rhoten v. Bowen*, 854 F.2d 667, 669 (4th Cir. 1988). Instead, the Commissioner must demonstrate that the termination of benefits was based on a consideration of all the evidence in the record and a finding that the claimant was able to engage in substantial gainful activity. *See* 42 U.S.C. § 423(f); *Crawford*, 935 F.2d at 656-57.

-26-

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Based on my review of the record, I find that the ALJ's decision is not supported by substantial evidence, and I will vacate the finding of the Commissioner and remand this case for further consideration. I do find, however,

that there is substantial evidence to support the ALJ's finding that Thomas's impairment does not meet the requirements for listing 12.05C. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C. Listing 12.05, in general, is structured differently from other mental disorders listings. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A. Specifically, the regulations state that:

> Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A.

> Listing 12.05 states that:

>> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental

-28-

period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05, 12.05C.

Therefore, alongside the two requirements in 12.05C, the introductory paragraph of section 12.05 creates an additional element required to meet the listing for mental retardation, creating a three-part test for the listing. *See Smith v. Barnhart*, 2005 U.S. Dist. LEXIS 5975, *10 (W.D. Va. Apr. 8, 2005) (citing *Barnes v. Barnhart*, 2004 WL 2681465, *4 (10th Cir. 2004)). Additionally, this introductory paragraph makes it clear that mental retardation is a lifelong, and not acquired, disability. *See Smith*, 2005 U.S. Dist. LEXIS 5975 at *10. Thus, to qualify as disabled under this listing, a claimant must demonstrate that she has had deficits in adaptive functioning that began during childhood and also demonstrate that she meets the IQ requirement and has a physical or other mental impairment imposing an additional and significant work-related limitation of function. *See Smith*, 2005 U.S. Dist. LEXIS 5975 at *10-*12; *see also* 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3) (2007) ("[An impairment] meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement.")

Thomas argues that (1) she possesses a valid performance scale IQ of 60 through 70, and (2) that she possesses a mental impairment that imposes an additional and significant work-related limitations of function. (Plaintiff's Brief 8-13.) She makes no argument, however, nor is there any evidence in the record, that she has had deficits in adaptive functioning that manifested during the developmental period. Also, Schacht testified that Thomas's school records, including her performance on certain standardized tests, did not suggest that she suffered from mental retardation. In order for Thomas to show that her impairment matches a listing, Thomas must "present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis in original); *see also* 20 C.F.R. §§ 404.1526, 416.926 (2007). "An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

Also, there is substantial evidence in the record to support the ALJ's finding that Thomas's Performance IQ score was invalid. (R. at 16.) Schacht testified that Thomas's score appeared to be inconsistent with the record. (R. at 27-29.) Schacht testified that Thomas's standardized test scores, obtained during her 6th, 8th and 11th grade years, did not suggest mental retardation. (R. at 29.) Schacht also stated that, "[o]verall, [he] found it difficult in light of the school record to support a conclusion that [Thomas's] performance IQ [was] related to intellectual limitation . . ." (R. at 29.) In January 1999, Friedman estimated Thomas's intellectual ability to be in the borderline range. (R. at 234.) Additionally, Miller and Spangler found Thomas to be a person of borderline intelligence. (R. at 353.) Thus, substantial evidence supports the ALJ's finding that Thomas's impairment did not meet or

-30-

equal the listing for mental retardation. I do not, however, find that substantial evidence supports the ALJ's finding that Thomas could perform unskilled work at all exertional levels. While the evidence of record, in particular Schacht's testimony, supports the ALJ's decision to give little weight to the functional assessment completed by Manuel, there is no evidence which supports his finding as to Thomas's mental residual functional capacity.

Once the ALJ rejected Manuel's opinion, he was left with the opinions of Miller and the state agency psychologists as to what, if any, limitations Thomas had on her work-related abilities. Schacht offered no opinion as to Thomas's work-related abilities, other than to question the validity of Manuel's assessment. Miller and Spangler and the state agency psychologists placed a number of limitations on Thomas's work-related abilities. In particular, Miller and Spangler found that Thomas had moderate limitations in her ability to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. at 358.) State agency psychologists Tenison and Hamilton found that Thomas was moderately limited in her ability to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to ask simple questions or request assistance and to accept instructions and respond appropriately to criticism from supervisors. (R. at 280-81.) These opinions are uncontradicted, and the ALJ may not simply disregard these opinions in favor of his own opinion on a subject

-31-

that he is not qualified to render. *See Young v. Bowen*, 858 F.2d 951, 956 (4th Cir. 1988); *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984).

*IV. Conclusion*

For the foregoing reasons, Thomas's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision terminating benefits will be vacated and the case will be remanded to the Commissioner for further consideration. An appropriate order will be entered.

DATED:      This 23rd day of May 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE